Conforming COPY

1   ROBERT C. BAKER, BAR ID #49255
    BAKER, KEENER & NAHRA, LLP
2   633 West 5th Street
    Suite 5400
3   Los Angeles, California 90071
    Telephone: (213) 241-0900
4   Facsimile: (213) 241-0990

5

6   Attorneys for *Plaintiffs and the Class*

7

8                                  **E-filing**

9              UNITED STATES DISTRICT COURT

10     IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   MATTHEW EVANS, CLYDE H.
     CAMPBELL, JR., individually and on behalf of
13   all others similarly situated,

               Plaintiffs,
14
     vs.
15
     AIR NEW ZEALAND;
16   ALL NIPPON AIRWAYS;
     CATHAY PACIFIC AIRWAYS;
17   EVA AIRWAYS;
     JAPAN AIRLINES INTERNATIONAL;
18   MALAYSIA AIRLINES;
     NORTHWEST AIRLINES;
19   QANTAS AIRWAYS;
     SINGAPORE AIRLINES;
20   THAI AIRWAYS.

21             Defendants.

22

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**ORIGINAL FILED**

NOV 1 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No.: **CV. 07 - 5821**

**CLASS ACTION COMPLAINT**

**COMPLAINT FOR VIOLATIONS
OF THE SHERMAN ANTITRUST
ACT 15 U.S.C. § 1**

**JURY TRIAL DEMANDED**

**VRW**

999-9999-0001

- 1 -

# TABLE OF CONTENTS

|  | Page |
|---|---|
| OVERVIEW OF THE ACTION | 3 |
| JURISDICTION AND VENUE | 4 |
| PARTIES | 5 |
| A. Defendants | 5 |
| B. Plaintiffs | 6 |
| C. Unnamed Co-Conspirators and Agents | 7 |
| DEFENDANTS' PROFITS FROM SURCHARGES | 7 |
| TRADE AND COMMERCE | 8 |
| CLASS ACTION ALLEGATIONS | 8 |
| THE DOJ INVESTIGATION | 10 |
| DEFENDANTS' SHARES OF THE PASSENGER MARKET | 11 |
| DEFENDANTS ACTED IN CONCERN ON FUEL SURCHARGES | 12 |
| TRADE ORGANIZATIONS | 14 |
| TRADE GROUP/ALLIANCE MEETINGS | 16 |
| DEFENDANTS' INSTANT ACCESS TO PRICE INCREASES | 18 |
| DEFENDANTS' ANTICIPATION OF FINES | 18 |
| ALLEGED VIOLATIONS | 19 |
| FRAUDULENT CONCEALMENT | 20 |
| INJURY TO PLAINTIFFS AND THE CLASS | 21 |
| PRAYER FOR RELIEF | 22 |
| JURY TRIAL DEMAND | 23 |

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

1    Plaintiffs Matthew Evans and Clyde H. Campbell Jr. ("Plaintiffs") individually and on behalf

2    of the Class described below bring this action for treble damages and injunctive relief against

3    Defendants, demanding a trial by jury.  Pursuant to the Federal Rules of Civil Procedure, Plaintiffs

4    bring this action under the federal antitrust laws of the United States, Section 1 of the Sherman

5    Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections  and 2 of the Clayton Antitrust Act

6    of 191, 15 U.S.C. §§15, 26 ("Clayton Act") against Defendants.  Plaintiffs complain and allege upon

7    information and belief except as to those paragraphs applicable to the named Plaintiffs, which are

8    based on personal knowledge, as follows:

9    **OVERVIEW OF THE ACTION**

10    1.    Plaintiffs bring this lawsuit as a class action on behalf of all individuals and entities who

11    purchased international passenger air transportation services from Defendant airlines, their

12    subsidiaries, agents or co-conspirators, during the period between 2004 and October 2007 (the "Class

13    Period").

14    2.    During the relevant period, the market price for international transpacific flights to and

15    from the United States was inflated because of collusive behavior.  In particular, Defendants

16    participated in cartel behavior to fix the prices of fuel surcharges on passenger air transportation, as

17    well as other charges for said services.

18    3.    This action arises from Defendants' international conspiracy to fix, raise, maintain

19    and/or stabilize prices for transpacific passenger flights to and from the United States.  This global

20    conspiracy among certain airlines includes the fixing of fuel surcharges on this transportation for

21    passenger transpacific flights.  Fuel surcharges are fees charged passengers to compensate for

22    increased fuel costs.  However, Defendants and other airlines conspired to increase revenue by

23    assessing inflated fuel surcharges.

24    4.    Defendants, at all relevant times herein, were airlines that conducted and sold passenger

25    air transportation and charged fixed fuel surcharges on that transport to airline passengers in the U.S.

26    and the world, including flights to and from San Francisco, California.  San Francisco International

27    Airport is considered a U.S. Gateway to Asian and Pacific countries.  For example, the U.S.

28    Department of Transportation reported that in 2005 Los Angeles International Airport and San

1   Francisco International Airport were ranked in the top U.S. passenger gateways to the world with 24.6

2   million gateway passengers.

3         5.      Defendants agreed, combined, and/or conspired with each other to fix, increase,

4   maintain, and/or stabilize the prices of passenger air transportation and fuel surcharges during the

5   Class Period.  As a result of Defendants' conspiracy and unlawful conduct, Plaintiffs and Class

6   members were charged artificially high prices for passenger air transportation and surcharges and have

7   been damaged thereby.

8                               **JURISDICTION AND VENUE**

9         6.      Plaintiffs bring this action pursuant to Sections 4 and 6 of the Clayton Act, 15 U.S.C.

10  §§ 15 and 26 to recover treble damages and injunctive relief and the costs of this suit, including

11  reasonable attorneys' fees, against Defendants and their unnamed co-conspirators for the injuries

12  sustained by the Plaintiffs and the members of the Class which they represent for violations of Section

13  1 of the Sherman Act, 15 U.S.C. § 1.

14        7.      Pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15

15  U.S.C. §§ 15 and 26 this Court has subject matter jurisdiction over this action.

16        8.      This Court has general and specific personal jurisdiction over each of the Defendants.

17  Each of the Defendants was engaged in an illegal price-fixing scheme and conspiracy that was directed

18  at and/or caused injury to persons and entities residing in, located in, or doing business in the United

19  States, including, but not limited to California and the Northern District of California.  At all relevant

20  times, each of the Defendants marketed and sold transpacific passenger air transportation services to

21  purchasers in the United States, including but not limited to, California.

22        9.      Pursuant to 15 U.S.C. § 22 and 28 U.S.C §§ 1391(b), (c), and (d) venue is proper in this

23  judicial district because during the Class Period many of the Defendants transacted business,

24  maintained offices, or were otherwise found within this district; and many of the Defendants' unlawful

25  acts giving rise to Plaintiffs' claim occurred, and a substantial portion of the affected trade and

26  commerce described below was carried out in this district.

27  ///

28  ///

§99-9999-0001

- 4 -

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## PARTIES

**A.    Defendants**

10.    Defendant **Air New Zealand** is the New Zealand national flag carrier, with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand.  Air New Zealand conducts passenger air transportation throughout the world, including transpacific flights into the United States and San Francisco.

11.    Defendant **All Nippon Airways** is a company incorporated under the laws of Japan with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan.  All Nippon Airways conducts passenger air transportation throughout the world, including transpacific flights into the United States, with a focus on San Francisco.

12.    Defendant **Cathay Pacific Airways** is a Hong Kong based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong Kong K3.  Cathay Pacific Airways conducts passenger air transportation throughout the world, including transpacific flights into the United States, with a focus on San Francisco.

13.    Defendant **China Airlines** is the flag carrier of the Republic of China, Taiwan with its principal place of business at 131 Naking E Rd., Section 3, Taipei, Taiwan.  China Airlines conducts passenger air transportation throughout the world, including transpacific flights into the United States, with a focus on San Francisco.

14.    Defendant **EVA Airways** is a Taiwanese company with its principal place of business at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan.  EVA Airways conducts passenger air transportation throughout the world, including transpacific flights into the United States and San Francisco.

15.    Defendant **Japan Airlines International** is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Singagawa-Ku, Tokyo 140-8605, Japan.  Japan Airlines International conducts passenger air transportation through the world, including into the United States, with a focus on San Francisco.

16.    Defendant **Malaysia Airlines** is the national carrier of Malaysia with its principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

1  Ehsan, Malaysia.  Malaysia Airlines conducts passenger air transportation throughout the world,

2  including into the United States and California.

3         17.    Defendant **Northwest Airlines** is incorporated in the State of Delaware with is principal

4  place of business at 2700 Lone Oak Parkway, Eagan, Minnesota 55121.  Northwest Airlines conducts

5  passenger air transportation throughout the world, including into and out of the United States and San

6  Francisco.

7         18.    Defendant **Qantas Airways** is the national carrier of Australia with its principal place

8  of business at 203 Coward Street, Qantas Centre, Mascot NSW 2020 C3.  Qantas Airways conducts

9  passenger air transportation throughout the world, including into the United States with a focus on San

10  Francisco.

11        19.    Defendant **Singapore Airlines** is the national airline of Singapore with its principal

12  place of business at Airline House, 25 Airline Road, 819829 Singapore.  Singapore Airlines conducts

13  passenger air transportation throughout the world, including transpacific flights into the United States,

14  with a focus on San Francisco.

15        20.    Defendant **Thai Airways** is the national carrier of Thailand with its principal place of

16  business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900.  Thai Airways conducts passenger

17  air transportation throughout the world, including transpacific flights into the United States and

18  California.

19        **B.    Plaintiffs**

20        21.    Plaintiff **MATTHEW EVANS** is a citizen of the State of California, Los Angeles

21  County.  Plaintiff Evans purchased passenger air transportation and paid fuel surcharges thereon from

22  Defendant Qantas Airways during the Class Period and has suffered pecuniary injury as a result of the

23  antitrust violations alleged herein.

24        22.    Plaintiff **CLYDE H. CAMPBELL, JR.** is a citizen of the State of California, Kern

25  County.  Plaintiff Campbell purchased passenger air transportation and paid fuel surcharges thereon

26  from Defendant Japan Airlines during the Class Period and has suffered pecuniary injury as a result of

27  the antitrust violations alleged herein.

28

999-9999-0001

- 6 -

23.    Plaintiffs identified in the preceding two paragraphs are collectively referred to herein as "Plaintiffs."

### C.    Unnamed Co-Conspirators and Agents

24.    Certain other persons, firms, corporations, trade groups and entities have participated as co-conspirators with Defendants in the violations and conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

25.    At all relevant times, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this action. Defendants, and each of them, have participated as members of the conspiracy or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

### DEFENDANTS' PROFITS FROM SURCHARGES

26.    Because Defendants controlled a large majority of the passenger air transportation services with their dominant combined market share during the Class Period, passenger air transportation customers were unable to shop their purchases to other carriers, allowing Defendants to reap enormous profits from the fuel surcharges.

27.    As surcharges are generally designed to compensate for increased external costs, they should bear a relatively constant relationship to external cost levels. Thus, in a competitive market, fuel surcharges should rise and fall at relatively constant ratios to the associated jet fuel costs. Since their inception in 2004, the ratio of Defendants' surcharges to external costs has increased steadily. The fuel surcharges bore no relationship to the Defendants' actual fuel costs or fuel cost increases.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

28.    The ratio of Defendants' profits to external costs was therefore quite high due to the concerted implementation and maintenance of the agreed-upon passenger air transportation and fuel surcharge price levels.  So despite record fuel costs during the Class Period, Defendants' fuel surcharges were actually responsible for outstanding profit growth for Defendants.

29.    In addition, fuel surcharges were often treated by Defendants and other carriers similar to a tax or other surcharge, such as an airport facility charge or a government mandated September 11 security charge.  As such, fuel surcharges were not always advertised as part of Defendants' fares, and were added onto the base fare as part of the purchase transaction.

## TRADE AND COMMERCE

30.    During the Class Period, Defendants made a substantial number of sales of international passenger air transportation tickets in a continuous and uninterrupted flow in international commerce to customers located in California, the United States and the world.

31.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate and foreign trade and commerce in the United States.

## CLASS ACTION ALLEGATIONS

32.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), Plaintiffs bring this action on their behalf and as a Class Action on behalf of the following Class:

>        All individuals or entities who, during the period from 2004 to
>        October 2007 (the "Class Period") purchased international
>        passenger air transportation for transpacific flights on Defendant
>        airlines, their subsidiaries or their co-conspirators or any
>        predecessor, subsidiary or affiliate of each, but excluding
>        governmental entities, Defendants, and their parents, predecessors,
>        subsidiaries, affiliates, and their co-conspirators.

33.    Although Plaintiffs do not know the exact number of Class members, since such information is the exclusive control of Defendants, Plaintiffs believe that due to the nature of the trade and commerce involved Class members are sufficiently numerous, likely tens of thousands of purchasers, and geographically dispersed throughout the United States and the world such that joinder

of all Class members is impracticable. The information as to the identity of the Class members can be readily determined from records maintained by Defendants and their agents, including but not limited to ticketing records and passenger manifests.

34.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs are purchasers of international passenger air transportation, all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

35.    Numerous questions of law and fact common to the Class arise from Defendants' anticompetitive conduct. Among those questions of law or fact common to the Class are:

    a.    Whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain, peg and/or stabilize the prices of international passenger air transportation and fuel surcharge prices affecting commerce in the United States and the world.

    b.    Whether Plaintiffs and other members of the Class were injured by the conduct of Defendants and if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

    c.    Whether the conspiracy violated Section 1 of the Sherman Act.

    d.    The duration of the conspiracy and the nature of character of the acts performed by Defendants in furtherance of the conspiracy.

    e.    The effect of Defendants' conspiracy on the passenger air transportation and surcharge prices charged in the United States and throughout the world during the Class Period.

    f.    Whether Defendants' actively concealed the contract, combination or conspiracy from Plaintiffs and other Class members.

    g.    Whether the conduct of Defendants caused prices of international passenger air transportation to be artificially inflated to non-competitive levels.

36.    These common questions of law and fact are common to the Class, and predominate over any other questions affecting only individual Class members.

999-9999-0001

- 9 -

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

37.    Plaintiffs are members of the Class and Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs purchased passenger air transportation and surcharges from one of more Defendants, and their interests are coincident with and not antagonistic to those of other members of the Class. Plaintiffs have no conflict with any other member of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in the prosecution of anti-trust and class action litigation.

38.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

39.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

40.    Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate a claim as is asserted in this Complaint. This class action represents no difficulties in management that would preclude maintenance as a class action. The Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the Defendants' files.

## THE DOJ INVESTIGATION

41.    With an eye on international routes, the U.S. Department of Justice ("DOJ") initiated an investigation into transatlantic and transpacific air passenger fuel surcharge conspiracies worldwide in early 2006.

42.    About 18 months later, on August 1, 2007, the DOJ announced a $300 million settlement with British Airways for price fixing on transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charted to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

43.    The DOJ also announced a settlement with Korean Air for fare price fixing on transpacific flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via fuel surcharges was widely reported to be Asiana Airlines, which sought amnesty.

44.    It was not the first time Korean Air and Asiana Airlines have been in hot water. The two airlines, among the top transpacific carriers in the world, in 2001 were implicated in collusion and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana Airlines that year for conspiring to set passenger air transportation services in Korea.

45.    The DOJ in its news release made it clear that the two settlements were only the tip of the iceberg, noting four different times that its investigation was "ongoing" into other carriers.

46.    In addition, several of the Defendants and unnamed co-conspirators have been identified as subjects and/or targets in investigations by the DOJ and the European Union into air cargo fuel surcharge price fixing. In both the air passenger and cargo investigations, Defendants and other airlines are accused of developing and participating in conspiracies to increase revenue by assessing inflated fuel surcharges.

47.    The targets, many of which are also named in civil suits, including Defendant All Nippon Airways, Asiana Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest Airlines, and Defendant Qantas Airways.

## DEFENDANTS' SHARES OF THE PASSENGER MARKET

48.    Individual Defendants possess a significant share of the market on their routes of travel. The principal competitors for the Defendants in the transpacific passenger air transportation market are, therefore, one another.

49.    Passenger air transportation is a commodity product that is fungible in the sense that air transportation provided by any one airline is readily substitutable for the air transportation provided by any other airline.

50.    Passenger air transportation is a homogenous service sold by airlines, including Defendants, to airline customers, including Plaintiffs and the members of the Class, primarily based on price.

51.    The passenger air transportation market in the United States and worldwide is highly concentrated and substantial barriers to entry in this market exist; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANTS ACTED IN CONCERT ON FUEL SURCHARGES

52.    Airlines compete with one another in their passenger air transportation rates. Services are fungible because a seat on one plane to a destination is a ready substitute for a seat on another plane to the same destination. Thus airline fares are the primary factor driving customer choice as between airlines.

53.    Competition for passenger business has kept airfares low enough that airlines now depend substantially on surcharges and fees for revenue. Surcharges generally are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

54.    Defendants, beginning in 2004, agreed to act in concert with one another in demanding the fuel surcharges to defray fuel costs from their customers. Defendants agreed on when and how much to increase the surcharges.

55.    These uniform fuel surcharges did not reflect the airlines' actual fuel costs per flight because each airline has different purchasing strategies for fuel.

56.    But for Defendants' passenger air transportation conduct, Defendants would have been unable to perpetrate the extent to which they increased the prices of their fuel surcharges.

57.    Defendants were aware that their imposition of fuel surcharges would not be successful if their competing carriers did not join them; otherwise customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise surcharges at about the same times and in the same amounts.

58.    The collusion of Japan Airlines International and All Nippon Airways ("ANA") on fuel surcharges on transpacific passenger air transportation is representative of the behavior of the other Defendants. Japan Airlines International and ANA agreed to raise and lower fares on nearly always the same dates and were in near lockstep on surcharges for transpacific fares:

59.    June 8, 2004, ANA files notice to raise international fares 5%, in the wake of increased fuel prices, effective **July 1**.

60.    June 8, 2004, Japan Airlines files notice to raise international fares 5%, in the wake of increased fuel prices, effective **July 1**.

61.    January 5, 2005, ANA announces it will add fuel surcharges of 2,500 yen on international fares on **February 1**.

62.    January 20, 2005, Japan Airlines announces it will add fuel surcharges of 2,500 yen on international fares on **February 1**.

63.    June 3, 2005, Japan Airlines files notice to raise its international fuel surcharge effective **July 1**.

64.    June 7, 2005, ANA files notice to raise its international fuel surcharge effective **July 7**.

65.    January 16, 2006, Japan Airlines files notice to raise its international fuel charge effective **March 1**.

66.    January 23, 2006, ANA files notice to raise its international fuel surcharge effective **March 1**.

67.    August 17, 2006, Japan Airlines files notice to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $113).

68.    August 31, 2006, ANA files notice to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113).

69.    November 16, 2006, Japan Airlines files notice to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

70.    November 16, 2006, ANA files notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

71.    March 19, 2007, Japan Airlines files notice to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

72.    March 20, 2007, ANA files notice to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91.

73.    May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen to 12,000 yen ($91 to $100).

74.    May 25, 2007, ANA files notice to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen to 12,000 yen ($91 to $100).

75.    August 15, 2007, Japan Airlines files notice to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen to 13,000 ($100 to $108).

76.    August 20, 2007, ANA files notice to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen to 13,000 ($100 to $108).

## TRADE ORGANIZATIONS

77.    Defendants' executives and managers, as well as the management of other air carriers, have met formally or informally since 2004 to conspire to artificially inflate fuel surcharges on international passenger transportation.  These meetings usually were at conventions of various trade associations such as the International Air Transport Association, the Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam Alliance.

78.    The **International Air Transport Association** ("IATA") of Geneva is a major factor in the conspiracy.  All of the defendants are members of the IATA, which was founded in 1945 in Havana, Cuba.  IATA represents more than 240 airlines comprising of 94% of scheduled international air traffic.  It describes itself as "the prime vehicle for inter-airline cooperation."  A resolution passed at a special IATA meeting in Geneva on May 28, 2004 played a role in triggering the fuel surcharge conspiracy.

79.    The **Association of Asia Pacific Airlines** ("AAPA") is another key in the conspiracy, with 10 of the Defendants listed as active members.  The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most powerful group representing the Asia/Pacific carriers.  The AAPA says its "member airlines carry 285 million passengers and 10 million tonnes of cargo representing

approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively."

80.    AAPA was born during a meeting of Asian airline executives in 1965 to discuss regional cooperation. The following year, Philippine Airlines, China Airlines, Korean Airlines and Malaysian Airlines officially formed the Orient Airlines Research Bureau. The group evolved into the Orient Airlines Association and in 1996 changed its name to Association of Asia Pacific Airlines.

81.    The stated purpose of AAPA is to foster close cooperation of its members. The AAPA describes itself this way: "The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, a reflection of the significant impact which the profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia Pacific airlines."

82.    Overlapping memberships in trade groups provided Defendants with ample opportunities to conduct cartel activities. The memberships include:

**Air New Zealand** is a member of the:

- Association of Asia Pacific Airlines.
- Star Alliance.
- International Air Transport Association.

**All Nippon Airways** is a member of the:

- Association of Asia Pacific Airlines.
- Star Alliance.
- International Air Transport Association.

**Cathay Pacific Airways** is a member of the:

- Association of Asia Pacific Airlines.
- oneworld.
- International Air Transport Association.

**China Airlines** is a member of the:

- Association of Asia Pacific Airlines.

- International Air Transport Association.

**EVA Airlines** is a member of the:

- Association of Asia Pacific Airlines.
- oneworld.
- International Air Transport Association.

**Japan Airlines** is a member of the:

- Association of Asia Pacific Airlines.
- oneworld.
- International Air Transport Association.

**Malaysia Airlines** is a member of the:

- Association of Asia Pacific Airlines.
- International Air Transport Association.

**Qantas Airways** is a member of the:

- Association of Asia Pacific Airlines.
- oneworld.
- International Air Transport Association.

**Singapore Airlines** is a member of the:

- Association of Asia Pacific Airlines.
- Star Alliance.
- International Air Transport Association.

**Thai Airways** is a member of the:

- Association of Asia Pacific Airlines.
- Star Alliance.
- International Air Transport Association.

## TRADE GROUP/ALLIANCE MEETINGS

83.    Executives and managers of Defendant airlines have attended numerous meetings where cartel-like activity was accomplished.  Here are a few examples of meetings where executives discussed and agreed on fuel surcharges:

999-9999-0001

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

84.    **May 28, 2004, Geneva**: International Air Transport Association Special Meeting. The No. 1 topic at this special meeting was soaring fuel costs and the result was a surcharge resolution by members. The Montreal Gazette reported on June 1, 2004, that members of the International Air Transport Association "might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, and IATA spokesperson said."

85.    **June 6-8, 2004, Singapore**: International Air Transport Association Annual General Meeting and World Air Transport Summit. This summit was attended by more than 600 airline executives and the main topic, cited by IATA CEO Giovani Bisignanai, was "record high fuel prices." On June 8, 2004, the last day of the meeting, Japan Airlines International and All Nippon Airways filed notices to raise international passenger fares because of high fuel costs. In a news release announcing the fuel surcharge, Japan Airlines International said: "The application (for the fuel surcharge) follows a special meeting of members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted." Japan Airlines International and All Nippon Airways also announced on June 8, 2004, that a five percent fuel surcharge would go into effect, on the same day for both airlines, July 1, 2004.

86.    **September 1, 2005, Tokyo**: International Flight Services Association, Global Leadership Conference – Asia Pacific. The them of this meeting was "The Challenge of Change" and it attracted such participants as Kriengsakdi Phatharacharukul, Director, Thai Airways; Hee Won Jo, Senior Manager, Asiana Airlines; Charles Grossrieder, a Manager for Cathay Pacific Airways; Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager, Northwest Airlines; and Shigeru Miyata, Vice Present, Japan Airlines.

87.    **December 5-6, 2005, Kuala Lumpur, Malaysia**: 2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006. At this meeting, titled "Towards Best Practice; Maximizing Revenues and Minimizing Costs," discussions of fuel surcharges were center stage. Participants included Stanley Kuppusamy, President, International Relations, Singapore Airlines; Dato Seri Bashir

1  Ahmad, Malaysia Airport's CEO; and Willy Boulter, Commercial Director for Virgin Atlantic

2  Airways.

3      88.    **November 9-10, 2006, Singapore**: 3rd Annual Asia Pacific & Middle East Aviation

4  Outlook Summit.  This annual meeting attracted executives from most of the Defendant airlines,

5  including Geoff Dixon, CEO of Qantas, and Huang Cheng Eng, Executive VP for Singapore Airlines.

6  "*Fighting Costs: Fuel prices and managing risk exposure,*" was one of the topics covered.

7      89.    **July 24-25-2007, Sydney, Australia**: Asia Pacific Aviation Summit.  Issues discussed

8  included the impact of the investigation by the U.S. Department of Justice into fare price fixing.

9  Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

10                   **DEFENDANTS' INSTANT ACCESS TO PRICE INCREASES**

11     90.    Defendants had the ability to check and did check to make sure the prices of passenger

12  air transportation and fuel surcharges agreed to in the conspiracy were uniformly fixed, raised,

13  maintained and/or stabilized.  Defendants had and have instant electronic access to any price increase

14  in the air passenger industry.  Defendant, other airlines, travel agencies and related businesses were

15  and are able to track fare information through the Airline Tariff Publishing Company ("ATPC"), which

16  gets the latest prices from more than 500 airlines an sends them by global distribution systems (GDS)

17  to subscribers.  Subscribers can receive updates as they happen or on a schedule of up to five times a

18  day.

19     91.    ATPC, with offices in Washington, D.C., London, Singapore and Sao Paulo, Brazil, is

20  owned by 24 air carriers, including Defendants Japan Airlines and Northwest Airlines.

21                      **DEFENDANTS' ANTICIPATION OF FINES**

22     92.    *Asahi Shimbun*, a Japanese daily newspaper, reported October 6, 2007 that Japan

23  Airlines would book a roughly $171 million charge for potential fines in global price fixing probe by

24  the DOJ and European Union officials.

25     93.    The newspaper said the decision "comes after the U.S. Justice Department fined British

26  Airways PLC and Korean Air Lines Co. $300 million each in August for fixing the prices of passenger

27  and cargo flights with other airlines.  The companies allegedly conspired to set fuel surcharges when

28  oil prices rose."

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

94.     Qantas Airways said on August 13, 2007 that it charged $40 million in anticipation of a settlement fine in the United States as a result of fuel surcharges and price fixing in its freight division. In a news release, Geoff Dixon, Qantas CEO, said: "On 1 August 2007, the U.S. Department of Justice announced that British Airways and Korean Air had agreed to plead guilty and pay separate US$300 million criminal fines for their roles in conspiracies to fix prices of passenger and cargo flights. British Airways subsequently announced that US$200 million of its fine related to cargo. Based on these developments, a decision has been made to make US$40 million (A$47 million) provision in the 2006/07 Financial Accounts... We have investigated this issue thoroughly and are confident that the unacceptable conduct was limited to a small number of people."

## ALLEGED VIOLATIONS

95.     During the Class Period, Defendants, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

96.     Defendants have combined and conspired to impose uniform fuel surcharges and other charges on international passenger air transportation as a means to raise prices for their services, rather than to recover actual costs.

97.     The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants, the main terms of which were to fix, raise, maintain and stabilize the prices of passenger air transportation services and fuel surcharges in the United States and the world.

98.     For the purpose of formulating and effectuating their contract, combination or conspiracy, Defendants did the following:

     a.     Agreeing to charge prices for passenger air transportation and fuel surcharges at certain levels at the agreed-upon rates in the United States and throughout the world;

     b.     Participating in meetings and conversations to discuss the prices of passenger air transportation and fuel surcharges;

c.   Issuing price announcements and price quotations in accordance with the agreements reached, thus signaling the hikes in the price of passenger air transportation and fuel surcharges; and

d.   Agreeing to manipulate prices of passenger air transportation and fuel surcharges in a manner that deprived purchasers of free and open competition.

99.   Because of the unlawful conduct of Defendants in furtherance of their continuing contract, combination and/or conspiracy, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for passenger air transportation services than they would have paid in absence of Defendants' price fixing.  The increases in passenger air transportation and fuel surcharges by Defendants cannot be explained by actual increases in fuel prices or supply/demand forces, but rather were the result of anticompetitive conduct and behavior.  This unlawful conduct resulted in Plaintiffs and Class members being deprived of the benefit of free and open competition.

100.   Plaintiffs and members of the Class, during the Class Period, purchased passenger air transportation directly from Defendants (or their agents, subsidiaries, and/or controlled affiliates).  The illegal combination and conspiracy alleged herein has had the following effects:

a.   Price competition in the pricing of passenger air transportation and fuel surcharges thereon has been restrained, suppressed, and/or eliminated;

b.   Price competition in the contracting of passenger air transportation has been restrained, suppressed, and/or eliminated; and

c.   Prices for passenger air transportation and fuel surcharges charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels.

## FRAUDULENT CONCEALMENT

101.   Defendants affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Class throughout the relevant period.

102.   Plaintiffs and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, until shortly before this litigation commenced, that Defendants

were violating the antitrust laws as alleged herein.  Plaintiffs and the members of the Class could not

discovered the violations earlier than that time because Defendants conducted their conspiracy in

secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently

concealed their activities through various other means and methods designed to avoid detection.  By its

nature, the conspiracy was self-concealing.

103.    Because of Defendants' active and purposeful concealment of their unlawful activities,

Plaintiffs and the members of the Class could not have discovered the unlawful conduct at an earlier

date through the exercise of reasonable diligence.

104.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to fuel

surcharges and other fees, which they affirmatively concealed, in at least the following respects:

      a.    By engaging in secret meetings and telephone calls in order to further their illicit

           cartel;

      b.    By agreeing not to discuss publicly, or otherwise reveal, the nature and

           substance of the acts and communications in furtherance of their illegal scheme;

           and,

      c.    By giving false and pretextual reasons for their pricing for passenger air

           transportation and fuel surcharges thereon, and by describing such pricing and

           increases falsely as being the result of external costs rather than collusion.

105.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the

Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs

and the members of the Class.

## INJURY TO PLAINTIFFS AND THE CLASS

106.    During the Class Period, Plaintiffs and the other members of the Class purchased

passenger air transportation services from Defendants or their subsidiaries, agents, and/or co-

conspirators, and, by reason of the antitrust violations herein alleged, paid more for such services than

they would have paid in the absence of the inflated fuel surcharges and other fees.  As a proximate

result of Defendants' unlawful contract, combination or conspiracy, Plaintiffs and the members of the

Class have sustained damages to their business and property in an amount to be determined at trial.

999-9999-0001

- 21 -

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

A.  A declaration that this action is a proper class action under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3).

B.  A declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act.

C.  An award of damages to Plaintiffs and each member of the Class, as provided by law, and joint and several judgments in favor of Plaintiffs and each member of the Class against Defendants, and each of them, in an amount to be trebled in accordance with the antitrust laws.

D.  Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition.

E.  An award to Plaintiffs and the Class for the costs of this suit, including expert fees and reasonable attorneys' fees as permitted by law.

F.  An award for such other and further relief as the nature of this case may require or as this Court deems necessary and appropriate.

DATED: November 13, 2007                    BAKER, KEENER & NAHRA, LLP

By _Robert C Baker_
ROBERT C. BAKER
Attorneys for Plaintiffs and the Class

999-9999-0001

- 22 -

CLASS ACTION COMPLAINT; JURY TRIAL DEMANDED

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: November 13, 2007                    BAKER, KEENER & NAHRA, LLP

                                            By _____
                                               ROBERT C. BAKER
                                               Attorneys for Plaintiffs and the Class